# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA A. MOHAIR, | Case No. 1:06-cv-00402 TAG |
| Plaintiff, | MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S APPEAL FROM ADMINISTRATIVE DECISION |
| vs. | |
| MICHAEL J. ASTRUE,[1] Commissioner of Social Security, | ORDER DIRECTING THE CLERK TO ENTER JUDGMENT FOR DEFENDANT AND AGAINST PLAINTIFF |
| Defendant. | |

Plaintiff Patricia A. Mohair ("Claimant") seeks judicial review of an administrative decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 et seq. Pending before the Court is Claimant's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). Claimant filed her complaint on April 7, 2006, and her opening brief on October 20, 2006.[2] (Docs. 1, 14). The Commissioner filed his opposition to the appeal on November 21, 2006. (Doc. 15). On December 21, 2006, Claimant filed her reply brief. (Doc. 17).

Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to proceed before a United States Magistrate Judge, and, by an order dated December 19, 2006, this action was assigned to the United States Magistrate Judge for all further proceedings. (Doc. 16).

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] Claimant refers to her opening brief as a motion for summary judgment. (Doc. 14). Although briefs filed in Social Security cases previously were deemed summary judgment motions, for several years this Court has termed the documents as "opening briefs," "responses" or "oppositions," and, "reply briefs." This memorandum opinion and order continues this trend.

**JURISDICTION**

On September 2, 2003, Claimant's application for DIB, dated August 29, 2003, was filed. (Administrative Record ("AR") 64-67). In her DIB, Claimant alleged an onset date of December 1, 1999. (AR 64). Because she was insured for DIB only through December 31, 2001, Claimant had to prove that her ailments precluded her from working between December 1, 1999 and December 31, 2001. (AR 70). The application was denied initially and on reconsideration. (AR 33, 35-38, 40-44).

After timely requesting a hearing, Claimant and her counsel appeared before Administrative Law Judge ("ALJ") James Berry on August 15, 2005. (AR 45, 402-424). On September 16, 2005, the ALJ issued a written decision finding that Claimant was not disabled. (AR 16-32). The Appeals Council denied Claimant's request for review on February 18, 2006. (AR 5-7). The Appeals Council's decision, therefore, became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g). The initiation of an appeal in the district court must be commenced within sixty (60) days of the Appeal Council's decision. 42 U.S.C. § 405(g). On March 7, 2006, Claimant timely filed her complaint. (Doc. 1).

**STATEMENT OF FACTS**

In her September 2003 application paperwork, Claimant alleged that she was disabled because she had multiple sclerosis, a brain tumor, hypothyroidism, and hypertension. (AR 78). She reported that her doctor advised her to stop working in December 1999, and she has not been gainfully employed since then. (AR 91).

At the August 15, 2005, administrative hearing, Claimant testified that she was born on September 16, 1945, making her 59 years old at the time of the hearing and 60 years old when the ALJ issued his decision. (AR 406). She stated that she attended college for three years, and completed all of the training required for one of her jobs. (Id.). Claimant further testified that, through 2001, she lived with her husband and their daughter, both of whom were working full-time. (AR 411).

Regarding her work history, Claimant stated that she last worked in 1996. (AR 407). She testified that, from 1985 until 1996, she worked for the Department of Motor Vehicles ("DMV"),

and had worked her way up to a manager when she was put on medical leave after being diagnosed with multiple sclerosis ("MS"). (AR 407-408). When she tried to return to work at the DMV, she was informed that the office was downsizing, but, at that time, she felt as though she could have resumed a full-time job. (AR 409). According to Claimant, she became incapable of working in December 1999, soon after being diagnosed with a tumor behind her optic nerve. (Id.).

Claimant testified that, starting in December 1999 and continuing through December 2001, her disabling medical impairments and associated symptoms included constant pain in her left eye, which she could not see out of, headaches, and weakness in her right leg. (AR 410). Claimant stated that she regularly saw various doctors and a nutritionist, and attended physical therapy. (AR 414-415). She testified that she was admitted to the hospital for rehabilitation after suffering an incident at home during which she fainted and was not able to move, although she does not recall when that occurred. (AR 416). After that, her doctor directed her to use a cane and, more recently, she started using a walker. (AR 415). Claimant further reported that, in May 2005, she underwent brain surgery. (AR 416). Claimant testified that the medications she took as of December 31, 2001, including medicine for her high blood pressure, provided her relief. (AR 415, 419). Claimant further testified that her condition has worsened, and at no point since 1999 has she felt that she was physically capable of working a full time job, that is, a job requiring that she work five days per week and eight hours daily. (Id.).

According to Claimant, from December 1999 through 2001, her husband did all of the household chores, yard work, and shopping, because she could not. (AR 412). Claimant further testified that her husband cared for her personal hygiene, i.e., bathing and dressing her, because she could not do it herself. (AR 414). As to her daily activities, Claimant testified that she generally stayed in bed, resting and listening to music. (AR 413). She further stated that, as of December 31, 2001, she could not engage in any pleasurable activities, such as traveling or going to the movies. (AR 419). Claimant added that, although she had attended church on Sunday, at some point she no longer was able to do so regularly. (AR 414). Claimant further stated that, to the best of her recollection, she did not drive during those years, but, she started to avail herself of a special city transport service for the disabled, which she continues to use. (AR 412-413).

With respect to her physical capabilities as of December 31, 2001, Claimant estimated that she could lift and carry 10 pounds; did not know the amount of walking she would have been able to do during an 8-hour day with regular breaks; could stand for 20 minutes, or 3-hours over an 8-hour day; and sit for 2-hours during an 8-hour day. (AR 417-418).

The ALJ then elicited testimony from Vocational Expert ("VE") Cheryl Chandler as to whether Claimant could perform her past relevant work or any work available in significant numbers in the national economy. (AR 420-423). The VE testified that Claimant's past relevant work as a DMV manager, although not specifically listed in the Dictionary of Occupational Titles ("DOT"), is light, skilled work. (AR 420). VE Chandler stated that Claimant's earlier DMV jobs, doing the drive test and counter work, are light and semi-skilled work. (AR 421). She added that, if her job as a clerk with the Employment Development Department ("EDD") counts as past relevant work, it would be considered skilled and sedentary. (Id.).

The ALJ posed a hypothetical to the VE, in which the individual was 56 years old, had completed at least three years of college, and whose past relevant work was as the VE described. In addition, the individual had a combination of severe impairments; a residual functional capacity ("RFC") to lift and carry 50 pounds occasionally and 25 pounds frequently; she could stand, walk, and sit 6 hours daily; occasionally push and pull with her legs; but must avoid exposure to unprotected heights and dangerous moving machinery. (AR 421). The VE responded that the hypothetical person would be able to perform all of the Claimant's previous jobs except the position as a driving examiner. (Id.).

In the second hypothetical, the individual had the same work history and impairments, but retained an RFC to lift and carry 35-50 pounds; walk and stand a maximum of 2 hours total; sit 8 hours; but may occasionally drop items because upper-extremity problems. (AR 421-422). VE Chandler testified that such a person would be able to perform Claimant's past sedentary job as an EDD clerk. (AR 422).

The ALJ's third hypothetical presents an individual similar to the one in the second question, but with a different RFC and limitations, as follows:

///

> [The individual] retains the [RFC] to sit six hours. This individual retain [sic] the ability to lift and carry 10 pounds occasionally and 5 pounds frequently. This individual retains the [RFC] to stand and walk one hour but must move about every hour. This individual is moderately limited in the area of grasping, gripping, and reaching. This individual would be required to take unscheduled breaks, frequency not known.

(AR 422). The ALJ defined "moderate limited" as significantly limited from engaging in the activity but not precluded from doing so. (AR 423). The VE responded that the described individual could not perform any of Claimant's previous jobs, or any jobs available in the national economy with the restrictions on grasping, gripping, and reaching set forth in the hypothetical. (Id.).

## RELEVANT LEGAL FRAMEWORK

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

### Standard of Review

Congress has provided a limited scope of judicial review of a Commissioner's decision. 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision to deny benefits, made through an ALJ, when the decision is based on the proper legal standards and is supported by substantial evidence. Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005). Substantial evidence is more than a mere scintilla but less than a preponderance. McAllister v. Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989) (quotations omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Webb, 433 F.3d at 686 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Moreover, such "inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" are accorded the same consideration as is substantial evidence as defined above. Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965).

On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quotation and citation omitted).

It is the role of the trier of fact, not this Court, to resolve conflicts in evidence. Richardson, 402 U.S. at 400. If the evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that would support a finding of either disability or non-disability, the Commissioner's decision is conclusive. Sprague v. Bowen, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). Nevertheless, a decision supported by substantial evidence will be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1987).

**Sequential Evaluation Process**

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. § 404.1520. Step one determines if he is engaged in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. § 404.1520(b). If he is not, the decision maker proceeds to step two, which determines whether claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c).

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform

other work in the national economy in view of his age, education and work experience. 20 C.F.R. §§ 404.1520(f). See Bowen v. Yuckert, 482 U.S. 137 (1987).

The initial burden of proof rests upon a claimant to establish a prima facie case of entitlement to disability benefits. Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted). In terms of the five-step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999) (italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

## ADMINISTRATIVE FINDINGS

Preliminarily, the ALJ noted that Claimant had applied for DIB and Supplemental Security Income in 1996, but she returned to work without requesting an administrative hearing after the applications were denied in 1997. (AR 19). ALJ Berry also stated that the issue before him was whether Claimant was disabled from December 1, 1999 through December 31, 2001. (AR 20).

The ALJ found at step one that Claimant "has not engaged in substantial gainful activity since the alleged onset of disability," i.e., December 1, 1999. (AR 20, 31). At steps two and three, the ALJ determined that Claimant had "multiple sclerosis, status post craniotomy," which were severe impairments but did not, singly or in combination, meet or equal the listed impairments in Appendix 1, Subpart P, Regulations No. 4.[3] (AR 21, 31). ALJ Berry added that Claimant's severe impairments did not meet or equal Listing 11.00, which addresses neurological impairments, and specifically did not meet Listings 11.04, 11.05, and 11.09 (multiple sclerosis). (Id.).

///

---

[3] 20 C.F.R. § 404 Subpt. P, App. 1.

7

The ALJ discussed Claimant's medical records and the medical opinions in detail for the relevant two-year period, as well as those after December 31, 2001. (AR 21-30). As discussed by the ALJ, the medical records document that on December 23, 1998, Claimant reported to Kaiser Permanente that she had a history of asymptomatic multiple sclerosis but would be out of the country and could not make any appointments until June 1999. (AR 21, 152). Claimant's next visit to Kaiser Permanente was on June 18, 1999, when she reported a history of hypothyroidism and hypertension, and was prescribed Levothroid and antihypertensive medications. (AR 21, 155). On June 21, 1999, Claimant underwent a neurological examination by neurologist Don Yoshimura, M.D. Claimant reported to Dr. Yoshimura that she had a history of asymptomatic multiple sclerosis that had been diagnosed in 1996 by an MRI; however, the MRI is not in the medical records and there is no medical confirmation of any episodes from 1996 to June 21, 1999. (AR 21, 26). At Dr. Yoshimura's initial examination, Claimant reported that she had done well since her original MRI. (AR 21).

Dr. Yoshimura's initial neurological examination revealed that "there were negative meningeal signs; full cervical range of motion, with no spine tenderness, and carotids had normal pulses. Claimant was oriented times 3, and memory was intact. Motor function was within normal limits, with normal tone, bulk and fine motor function; strength was normal. Gait was normal, with negative Romberg. Vibration decreased in the right foot, but deep tendon reflexes were symmetric and normal in amplitude." (AR 21, 156). Dr. Yoshimura diagnosed probable multiple sclerosis by history, determined that Claimant was asymptomatic, and wrote that he would not treat her further. (AR 21). He also discussed with Claimant the option of immunomodulatory therapy, which Claimant declined. (AR 21, 156 ). Claimant told physician's assistant Cynthia Duke that she was leaving the country for six months, but would be back for one week, from December 26, 1999 to January 3, 2000. (AR 21, 155).[4]

///

---

[4] Dr. Yoshimura's written neurology consultation report of the June 21, 1999 examination documents his impression of "[p]robable multiple sclerosis by history," and his recommdation that "[for now, as [Claimant] is asymptomatic, will not treat further. Went over option of immunothereapy at this time. [Claimant] preferred not to." (AR 156).

1   On December 27, 1999, Claimant underwent a brain MRI. (AR 22, 159). As discussed by the ALJ and documented in the medical records, the MRI revealed "periventricular plaques compatible with demyelinating processes, including multiple sclerosis; mild marginal enhancement of plaques indicated some activity although not compatible with aggressive inflammatory response. (AR 22, 159).

On January 3, 2000, Claimant underwent a gynecological exam. As discussed by the ALJ and reflected in the medical records, "[h]er hypertension was well-controlled . . . [her] hypothyroidism was controlled . . . [and her] pap smear showed atypical squamous cells of undetermined significance." (AR 22, 163). Plaintiff left the country and returned to Germany after this examination, and her daughter-in-law advised Kaiser Permanente that Claimant would not return until December 2000. (AR 22, 163).

On January 29, 2001, Claimant returned to Kaiser Permanente for a further medical examination. As discussed by the ALJ and documented by the medical records, Claimant reported that she had obtained 2 pap tests in Germany, which had been within normal limits. The January 29, 2001, exam revealed that Claimant's hypertension was "not well controlled . . . and her antihypertensive medications were adjusted." (AR 22, 173-174). On February 5, 2001, Claimant's hypertension was controlled. (AR 22, 171-172).

Claimant returned to Kaiser Permanente for a medical visit on April 23, 2001, when she complained of dizziness getting out of bed in the morning, and explained that she was going on a cruise in one week. (AR 22, 178-179). As discussed by the ALJ and documented in the medical records, on April 27, 2001, Claimant complained of dizziness when she stood up, but denied headaches, chest pain, shortness of breath or blurred vision. Claimant was encouraged "to move slowly" and told to return for a further medical visit when she returned from her cruise. (AR 22, 180). Claimant returned to Kaiser Permanente on May 7, 2001, when she underwent a neurological examination by Dr. Yoshimura, who concluded there were no new symptoms since her last examination in 1999. (AR 22, 191). As discussed by the ALJ and documented in Claimant's medical records, Claimant's "[s]trength, fine motor function, and gait were all okay, and Romberg sway was negative. Claimant was taking no medication for multiple sclerosis. Claimant was

9

diagnosed with mild multiple sclerosis, and was counseled regarding the pros and cons of ABC therapy, but she decided not to take this treatment at that time. Claimant was scheduled for a routine neurological followup in one year." (AR 22, 191).

As discussed by the ALJ and documented in the medical records, on May 15, 2001 Claimant's visual acuity was 20/40 on her right eye and 20/50 on her left eye, and on May 23, 2001, her hypertension was "well controlled." (AR 22, 186, 188-189). Claimant reported that she was feeling better and had no dizziness. (AR 22, 188). On July 19, 2001, her blood pressure was well controlled at 120/90 . (AR 190, 191). Claimant underwent a colonoscopy on August 16, 2001, which revealed mild diverticulitis. (AR 22, 192-195).

As discussed by the ALJ and documented by the medical records, on May 15, 2002, Claimant underwent a routine neurological examination by Dr. Yoshimura, reporting no new symptoms. Claimant reported that she was doing okay and her blood pressure at home was normal. Dr. Yoshimura diagnosed that Claimant had multiple sclerosis and was doing well; there was no indication for ABC therapy, and Claimant was scheduled for a routine neurological followup in one year.[5] (AR 22, 199). Claimant returned to Kaiser Permanente on October 22, 2002, reporting cloudy vision and explaining that she had run into objects later in the day. (AR 23, 208). She underwent a head MRI on November 18, 2002, which revealed evidence consistent with multiple sclerosis, an incidental finding of a nonfunctioning pituitary lesion, and compression of the optic chiasm. (AR 23, 208-208, 214-215). A January 16, 2003 field study showed that Claimant's visual field was within normal limits. (AR 23, 217-223).

On February 5, 2004, Claimant reported increased problems with gait and visual blurring later in the day. (AR 23). As discussed by the ALJ and documented in the medical records, "[o]n examination, strength and motor functioning were all OK, but her gait had some ataxia, worse with

///

---

[5] Dr. Yoshimura's written report states "Benign ms-Doing well. No indication for ABC therapy at present." (AR 199).

10

tandem; Romberg was positive."[6] (AR 23).  Claimant underwent a brain MRI on February 20, 2004, which disclosed that the pituitary lesion was unchanged in size. (AR 23, 265).

As discussed by the ALJ and documented in the medical records, Claimant underwent a consultative internal examination by Diane Kecskes, M.D. on February 16, 2004. (AR 23, 130-137). Claimant was not taking any multiple sclerosis medications. Upon physical examination, Dr. Kesckes found that Claimant's visual acuity with glasses was 20/50 for both eyes. (AR 133). Claimant's heel to shin was unsteady and near falling, and a positive Romberg sway was observed. (AR 23, 134).  Claimant's range of motion of the cervical spine, joints, and lower extremities were within normal limits, her lumbar spine forward flexion was 60 degrees, her wrists, knees, hips, and ankles were within normal limits, and her pulses were normal. (AR 23, 135).  Dr. Kecskes determined that Claimant's speech and hearing were intact, that she had good tone and turgor and a normal range of motion, and her strength was 5/5 in all extremities, with no atrophy. (AR 23, 135). Dr. Kecskes determined that Claimant had mild neurological deficits in the form of decreased vibratory/pinprick sensation, and sluggish reflexes. (AR 23, 136).  Dr. Kecskes determined that although Claimant complained of weakness, she was able to carry/lift 35 pounds while sitting and occasionally lift 50 pounds while sitting.  (AR 23, 136-137).  Dr. Kecskes also concluded that Claimant had no limitations in pushing or pulling, her range of motion was adequate, and she had no manipulative limitations. (AR 23, 137).

Claimant's next medical visit was on May 14, 2004, when she complained of fatigue, decreased sleep, blurry vision after three hours, and imbalance in the afternoon. (AR 23, 231).  On June 2, 2004, it was found upon examination that Claimant had vibration decrease in her toes, and some increase in gait ataxia."[7] (AR 23, 273). Claimant's multiple sclerosis was determined to be stable clinically, with some waxing and waning of symptoms, and it was doubted to be true exacerbations. (AR 23, 273).  At a physical therapy evaluation on June 23, 2004, Claimant reported

---

[6] Claimant was seen by PA Duke on February 5, 2004, when she reported increased gait imbalance and visual blurring. (AR 23, 265). PA Duke concluded that Claimant's "[s]trength, fine motor, ftn. all OK, [g]ait with some ataxia, worse with tandem" and her Romberg was positive. (AR 23, 268).

[7] Claimant's medical records reflect that on June 2, 2004, Claimant's "[s]trength, fine motor OK. Gait with some ataxia, neg. ROM. Vibr.decr in toes, proprio ok. " (AR 273).

that she recently returned from living in Germany for four years. (AR 385). Claimant denied pain or numbness, but reported a decrease in visual acuity when fatigued, and of decreasing balance. (AR 23, 385).

After discussing Claimant's testimony, ALJ Berry concluded that, in light of the record evidence, Claimant's testimony was not credible as to the limitations she asserted or under Social Security Ruling ("SSR") 96-7p. (AR 21-22, 25-28, 31). The ALJ gave controlling weight to the DDS physicians' assessment of Claimant's RFC that, during the relevant time period, Claimant retained a medium RFC with some restrictions. (AR 29). In an RFC Assessment form dated March 16, 2004, the DDS physician concluded that Claimant could occasionally lift and carry 50 pounds, and frequently lift and carry 25 pounds; could stand, walk and sit 6 hours in an 8 hour work day; was limited in her ability to push and or pull with her lower extremities; but had no other limitations. (AR 142-146). The DDS physician concluded that Claimant's MRI evidenced that she suffered a mild demyelinating disease during the relevant period. (AR 147). This RFC was affirmed by a second DDS physician on August 6, 2004. (AR 149). The record evidence also included an analysis by a DDS physician summarizing Claimant's medical records from June 1999 through Dr. Kecskes's 2004 evaluation, in which the DDS physician concluded that Claimant's allegations were partially credible, and confirmed that she suffered a mild demyelinating disease during the relevant period, and a subsequent incidental brain lesion . (AR 150-151).

Specifically, the ALJ found that from December 1, 1999 through December 31, 2001, Claimant could lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit for 6 hours each; occasionally push and pull with her lower extremities; but should avoid exposure to unprotected heights and dangerous moving machinery. (AR 29, 31). After questioning a Vocational Expert as to the ability of someone like Claimant to return to her previous work, the ALJ concluded that Claimant could return to her prior jobs as a DMV counter worker, office manager, or an EDD clerk. (AR 30-31). Because, as of December 31, 2001, Claimant's severe impairments did not preclude her from performing some of her past relevant work, the ALJ found, at step four, that Claimant was not disabled and, accordingly, not entitled to DIB. (AR 32).

///

**ISSUES**

In her opening brief, Claimant asserts that the Commissioner erred as a matter of law, and that his decision was not supported by substantial medical evidence. (Doc. 14). Claimant alleges that:

The ALJ erroneously ignored post-insured[8] medical evidence and opinions when he determined Claimant's RFC.

As discussed above, this Court must uphold the Commissioner's determination that claimant is not disabled if the Commissioner applied the proper legal standards and there is substantial evidence in the record as a whole to support the decision.

**DISCUSSION**

**The ALJ's determination of Claimant's residual functional capacity.**

Claimant contends that the ALJ erred in determining that she retained an RFC that enabled her to perform medium work with some limitations, and that she could return to some of her past relevant jobs, given the subsequent medical opinions and Claimant's testimony.[9] (Doc. 14, pp. 13-15). Claimant acknowledges that there was little in the way of medical evidence in support of her medical disability before her date last insured ("DLI," see fn. 8). (Doc. 14, p. 14). She argues, however, that, before her DLI, she developed a tumor that precluded her from seeing with her left eye, which, in addition to weakness in her right leg, and head and left-eye pain, prevented her from working. (Doc. 14, p. 13, citing AR 410). Claimant then addressed her testimony regarding her

---

[8] In order to qualify for disability benefits under Title II, a claimant must have "insured status." 42 U.S.C. § 423(a) and (c). As set forth in the regulations, "insured status is a basic factor in determining [entitlement to] disability insurance benefits." 20 C.F.R. § 404.101(a). Insured status under Title II is measured in terms of quarters of coverage ("QC"). 20 C.F.R. § 404.110(a). QCs, in turn, are accumulated based upon a worker's earnings over time. In general, workers "are credited with QCs based on the wages . . . paid and the self-employment income [derived] during certain periods." 20 C.F.R. § 404.101(b). To be eligible for disability insurance benefits under Title II, a worker must have earned a sufficient number of QCs within a rolling forty quarter period. 20 C.F.R. § 404.130(b)(2). Under most circumstances, the claimant must have a minimum of twenty quarters of coverage. Id. This requirement for disability insured status commonly is referred to as the "currently insured" or "special insured" status requirement and has become known as the "20/40" requirement. The termination of a claimant's insured status is frequently referred to as the "date last insured" or "DLI." Here, Claimant's DLI is December 31, 2001.

[9] Claimant does not dispute the ALJ's finding that her testimony was not entirely credible. (See Doc. 14). Accordingly, to the extent that she mentions her testimony, that portion of Claimant's argument will not be discussed as a separate issue. Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001); Bergfeld v. Barnhart, 361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005) (courts only address issues raised by the parties); (AR 25, 28, 31).

severe limitations, but did not point to any record evidence in support of this testimony nor contend that the ALJ erred in finding her subjective testimony not credible. (Doc. 14, p. 14, citing AR 412-419; see generally Doc. 14, AR 402-424). Claimant asserted that the ALJ erred in rejecting the 2004 medical evidence and opinions obtained from examining physicians, claiming that the ALJ's failure to consider the 2004 reports resulted in an RFC determination that was not supported by an "affirmative medical source from at least [one] examining source." (Id.). Claimant contends that the ALJ's RFC assessment lacked any medical support and must be discarded. (Doc. 14, p. 15). It is noteworthy that Claimant cited no caselaw, Social Security rulings, or regulations in support of her arguments. (See generally Doc. 14).

An RFC is a determination made by the ALJ between sequential steps three and four as to what the claimant is capable of doing despite her limitations. Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007); SSR 96-8p. It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities." SSR 96-8p. In assessing [the claimant's] RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. Id. The ALJ, however, may consider all relevant record evidence. Id.

In a DIB case, the claimant bears the burden to demonstrate that she was disabled before her DLI. Morgan v. Sullivan, 945 F.2d 1079, 1080 (9th Cir. 1991)(citations omitted). If the claimant can later prove that her disability existed on, and has continued from a time before, her DLI, she may be entitled to benefits by way of a "retrospective diagnosis." Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1461, n.4 (9th Cir. 1995). In general, courts demand a great deal before they will grant benefits based on a retrospective diagnosis. Id. at n.4 & 5; 158 A.L.R. Fed. 299. A recent Central District of California opinion, which relied on several Ninth Circuit decisions,[10] held that the mere fact that a treating physician had not seen the claimant before the DLI did not constitute a

---

[10] In support of the portion of the district court's case addressed in this memorandum opinion and order, the Central District of California cited Morgan v. Commissioner of the Soc. Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999); Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1461, n.5 (9th Cir. 1999); Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995); and Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988).

sufficient basis for rejecting that doctor's opinion. Lesmeister v. Barnhart, 439 F.Supp.2d 1023, 1030-1031 (C.D. Cal. 2006). A retrospective opinion of a recent treating physician generally does not take precedence over the reports of an earlier treating physician, nor is a retrospective opinion, by itself, sufficient to find that claimant was disabled before her DLI – there must be contemporaneous record evidence that supports the retrospective opinion. Vetsch on behalf of Vetsch v. Shalala, 30 F.3d 140 (Table), 1994 WL 399676,*2-3 (9th Cir. 1994); Magallanes v. Bowen, 881 F.2d 747, 754 (9th Cir. 1989); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Diaz v. Secretary of Health & Human Servs., 1995 WL 347038, *6-7 (E.D.N.Y. 1995); Potter v. Secretary of Health & Human Servs., 905 F.2d 1346, 1347-1349 (10th Cir. 1990).

The courts distinguish among the opinions of three types of physicians: treating physicians, physicians who examine but do not treat the claimant (examining consultants) and those who neither examine nor treat the claimant (nonexamining physicians). Lester v. Chater, 81 F.3d 821, 839 (9th Cir. 1996). A treating physician's opinion generally is given special weight because of his familiarity with the claimant and the claimant's condition. Fair v. Bowen, 885 F.2d 597, 604-605 (9th Cir. 1989). Thus, more weight is given to a treating physician than an examining consultant. Lester, 81 F.3d at 830. In order to reject the opinion a treating physician, the ALJ must provide "clear and convincing" reasons. Fair, 885 F.2d at 604-05. When a treating physician's opinion is contradicted by another doctor, the ALJ may reject the treating physician's opinion only if he provides "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). Similarly, an ALJ must provide specific, legitimate reasons that are supported by substantial evidence for rejecting an examining physician's evaluation or opinion. Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citations and quotations omitted); see also, Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995) ("An ALJ may reject the testimony of an examining, but nontreating physician, in favor of a nonexamining, nontreating physician when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence"). A nonexamining physician's opinion generally cannot be accorded more weight than those of examining or treating physicians. Lester, 81 F.3d at 830; but see Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where the opinion

of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.")

Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the ALJ to disregard the opinion of a treating or examining physician. These reasons include: conflicting medical evidence, the absence of regular medical treatment during the alleged period of disability, and the lack of medical support for physicians' reports that are based substantially on the claimant's subjective complaints of pain. Flaten,, 44 F.3d at 1463-64; Fair, 885 F.2d at 604. The ALJ also may disregard a physician's opinion that is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion." Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986) (brackets added). Accepting or rejecting the retrospective opinion of a treating physician or examining consultant renders the ALJ's job more difficult, given that he has to determine whether the opinions impacted the claimant's ability to work years before the opinion was written or the examination was performed.

In the instant case, ALJ Berry thoroughly discussed Claimant's medical evidence, noting that Claimant had the burden to establish that she was disabled, and that she failed to do so. (AR 20-30). In assessing Claimant's RFC, the ALJ noted that, before December 1, 1999, and through December 31, 2001, Claimant was treated by Dr. Yoshimura and PA Duke at Kaiser Permanente. (AR 21-22). ALJ Berry summarized the neurological records from June 1998 through March 2002, which were confirmed by MRIs, and diagnosed asymptomatic, benign MS, with reports that Claimant was doing well, and for which Claimant repeatedly refused treatment. (Id., citing AR 153-54, 156, 159, 181, 199). Claimant followed up with Dr. Yoshimura every year. (See AR 20-21 and cites therein).

The ALJ also reported that Claimant suffered from hypertension, hypothyroidism, and low potassium levels, and abnormal pap smears, which he did not find were severe impairments. (AR 21-22). An MRI in November 2002 revealed that she developed a pituitary macroadenoma with compression to the optic chiasm, but there was no indication that it was related to her asymptomatic, stable MS, and she underwent surgery to remove it (a craniotomy) in May 2005, after which she was

disoriented and mentally altered for a few weeks. (AR 23-24). In 2004, Claimant complained of MS-related symptoms, such as gait ataxia, but clinically her MS was stable with waxing and waning symptoms which were considered not true exacerbations. (AR 23).

In February 2004, Dr. Diane Kesckes performed an examining consultation at the request of the Social Security Administration. (AR 130-137). After examining Claimant, Dr. Kesckes' assessment was that Claimant had could sit with no limitations or restrictions; she likely could walk at least 30 minutes out of every 1-2 hours; she would be able to carry and lift 35 pounds frequently and 50 pounds occasionally while sitting; Claimant had no limitations in pushing or pulling, no postural limitations; she may drop items and, due to her subjective complaints, she could be light headed when arising from a sitting, stooping, crawling, or kneeling position. (AR 136-137). Although the ALJ gave some weight to Dr. Kesckes' evaluation, he did not give it controlling weight because her evaluation did not take into consideration Claimant's subjective comments before 2004 or evaluate Claimant's maximum RFC as of the DLI; however, Dr. Kescke confirmed that Claimant had a medium RFC with some minor limitations. (AR 28).

In July 2004, Dr. Yoshimura completed a Multiple Impairments Questionnaire, which apparently was prepared by, and returned to, Claimant's attorney. (AR 277-284). According to Dr. Yoshimura, Claimant was severely limited and could not work an eight-hour day at the present time. (Id.). PA Cynthia Duke completed an identical form in August 2004, in which she reported that Claimant had some of the same limitations and was incapable of working. (AR 390-397). ALJ Berry rejected Dr. Yoshimura's opinion because it was inconsistent with his treatment records and the results of Claimant's MRI's, both of which indicated that, at least through 2002, Claimant's MS was mild and asymptomatic. (AR 29). Moreover, the ALJ noted that Dr. Yoshimura requested that Claimant see him only on an annual basis during and after the relevant time period. (Id.). Essentially, the ALJ found that Claimant's treating neurologist's opinion was inconsistent with the medical records, including the contemporaneous records, and, thus, should not be accorded any significant weight. (Id.); Flaten,, 44 F.3d at 1463-64; Fair, 885 F.2d at 604. The ALJ rejected PA Duke's opinion for the same reasons, concluding that both Dr. Yoshimura's and Ms. Duke's opinions were accommodations to enable Claimant to receive disability benefits. (AR 29).

Because there was a lack of evidence from which the ALJ could ascertain Claimant's accurate RFC as of her DLI, he gave controlling weight to the DDS physicians, who reviewed the records during the relevant period – not retrospectively – and determined an objective RFC based on the then-existing records. (AR 29). The ALJ provided substantial and legitimate reasons for rejecting the 2004 opinions of Claimant's treating physician, PA, and discounting the examining consultant, i.e., that they did not consider Claimant's capabilities as of the DLI or their opinions were inconsistent with their own progress notes, treatment records and examinations, and there were no corroborating records from the relevant time. For example, in rejecting the opinions of Dr. Yoshimura and PA Duke, the ALJ referenced their progress notes and treatment records in which they concluded that Claimant was "doing well," her gait was okay, and described her multiple sclerosis as mild or asymptomatic. In providing his reasons for rejecting Dr. Yoshimura's opinion that Claimant was disabled, the ALJ correctly concluded that Dr. Yoshimura's July 2004 multiple impairments questionnaire opinion that Claimant's limitations applied since she was in high school, which would have been in the 1960's, is not supported by the medical record or Dr. Yoshimura's own treatment records and examinations through December 2001, in which he found Claimant's multiple sclerosis to be benign. (AR 29). The ALJ further explained that Dr. Yoshimura's opinion is not supported by the objective medical evidence, because the December 1999 brain MRI was described as mild. (AR 29). The ALJ further explained that he rejected the assessment because it lacked signs, symptoms, durations, or the bases for disability prior to December 31, 2001, and there was no evidence that Claimant suffered diminished strength, or abnormal gait, coordination, or motor function, and did not report clouded vision until October 2002. The ALJ also noted that Claimant did not receive treatment for her multiple sclerosis prior to December 31, 2001, and had been working steadily since at least 1979. (AR 20).

The ALJ did not err in relying on the DDS assessments and consultation that were limited to the period ending December 31, 2001 and are consistent with the records from that period, particularly when, as here, there are no corroborating records from that period that support the opinions of Dr. Yoshimura or PA Duke . Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995); (See AR 142-51). Moreover, contrary to Claimant's argument, the ALJ's RFC is supported by medical

1  records – specifically those in the file as of the date that the DDS completed their RFC and
2  consultation. (See generally AR). Further, the DDS physicians relied on the same medical records
3  and clinical findings as did Claimant's treating neurologist and PA and made almost the same
4  findings as the latter did in their progress reports and as the examining consultant did in her
5  evaluation. (See 130-37, 142-51; see also Kaiser Permanente Medical Records).

6  Based on the foregoing, the Court finds that the ALJ's conclusion that the retrospective
7  opinions are insufficient to find Claimant disabled as of the DLI is supported by substantial and
8  legitimate reasons that are detailed by the ALJ and supported by substantial evidence. The Court
9  finds that the ALJ applied the proper legal standards and there is substantial evidence in the record
10 as a whole to support the ALJ's decision.

11 Accordingly, IT IS HEREBY ORDERED THAT:

12 (1)  Plaintiff's Social Security complaint is DENIED; and

13 (2)  The Clerk of the Court is DIRECTED to enter judgment for Defendant, Michael J.
14 Astrue, and against Plaintiff, Patricia A. Mohair.

16 IT IS SO ORDERED.

17 Dated:   **September 28, 2007**                     **/s/ Theresa A. Goldner**
                                                      UNITED STATES MAGISTRATE JUDGE